TMC WORLDWIDE, L.P., Appellant,

v.

**Richard GRAY, Appellee.**

**No. 01–04–00624–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

May 26, 2005.

Bennett S. Bartlett and T. Brooke Farnsworth, Farnsworth & VonBerg, Houston, for Appellant.

Christine R. Thrash, Richard Joseph Tholstrup, Houston, for Appellee.

Panel consists of Justices NUCHIA, HANKS, and HIGLEY.

## OPINION

GEORGE C. HANKS, JR., Justice.

Appellant, TMC Worldwide, L.P., appeals from the denial of its application for a temporary injunction in its suit to en-

force a non-competition covenant and misappropriation of trade secrets. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon Supp.2004–2005). In two points of error, TMC argues that the trial court abused its discretion by not enjoining Richard Gray, appellee, (1) from continuing to use TMC's trade secrets in competition with TMC and (2) from continuing to compete against TMC in violation of Gray's covenant not to compete. We affirm.

## Background

Glenn Atkinson was the sole owner of Automatic Insect Control Enterprises, Inc. (AICE), a business that installed a nozzle placement system around homes that had a time-released emission of insecticides to eliminate mosquitos and other biting insects around the house. Atkinson explained that the business survived on referrals and the monthly maintenance of the systems.[1]

In June 2001, Richard Gray signed a confidentiality agreement and became an at-will marketing consultant for AICE. AICE operated under the business name Champions Mosquito Control ("Champions") in Houston. The confidentiality agreement contained a covenant not to compete and provided as follows:

Whereas, [Gray] would like to receive and review confidential information relating to the products and business of AICE, AICE agrees to provide such information with absolute performance of the following points:

1. [Gray] agrees to accept and maintain in confidence all trade secrets, formulas and other confidential business information which [Gray] receives during consultation with AICE and further agrees to protect

the same against disclosures to unauthorized persons.

2. In addition, [Gray] agrees not to use, directly or indirectly, for [his] own benefit or for the benefit of any other person, firm, corporation, etc., any confidential business information, trade secrets or formulas disclosed to [Gray] during or as a result of consultation with AICE or review of AICE's confidential information. It is understood that such information may be disclosed by [Gray] to employees of [his] company when necessary in furtherance of the relationship which exists between [Gray] and AICE; however, all such employees who receive such information shall agree to the terms of the AGREEMENT.

3. These obligations shall not apply to any information which is in the public domain as evidenced by printed publication and shall terminate if such information shall become public in such manner, except for such publications caused by an act or omission on [Gray's] part in breach of the AGREEMENT. In addition, these obligations shall apply to any information which is presently in [Gray's] possession or which may be disclosed to third persons without [Gray's] solicitation.

4. Notwithstanding the termination of this Agreement, [Gray] agrees that for a period of three (3) years following any termination they [sic] will not directly or indirectly in any capacity either as owner, partner, shareholder, broker, dealer, agent, employee, consultant, or otherwise, engage in the business of providing any program, service, equipment or

1. Customers were charged approximately $235 a month to refill the insecticide.

product similar or competitive with the operation of AICE.

5. AICE and [Gray] agree that the foregoing restrictions which pertain to the three (3) year period immediately following the termination of this agreement, are reasonable, but recognize that damages in the breach of these restrictions will be difficult to ascertain and, therefore, agree that in addition to and without limiting any other remedy or right AICE may have, AICE shall have the right to an injunction against [Gray] issued by a Court of competent jurisdiction enjoining any such breach.

Atkinson testified that, when he started working for AICE, Gray signed this confidentiality agreement containing a non-compete clause, and he was given a customer list.[2] However, Gray testified that he was not given a customer list until June 2002, one year after he started working for AICE.[3] In October 2002, Gray stopped coming to work. He never quit and was not fired.

John Fleming, who lived in Corpus Christi, contacted Atkinson because Fleming was interested in getting a system from Champions. Don Carlson, a Champions consultant, went to Fleming's home and told him about the system. In November 2002, Carlson returned to give Fleming an estimate, and, this time, Carlson was accompanied by Gray. Gray and Carlson informed Fleming that they were "branching off" of the company and starting their own business to compete with Atkinson. They gave Fleming an estimate from Champions, and then under-cut it with a bid from their new venture, Affordable Automatic Mosquito Control (AAMC). Fleming testified that Gray told him that Champions was "going under." Fleming bought a system from AAMC. Fleming testified that Gray inquired if Fleming would be interested in becoming a distributor for AAMC. Fleming testified that he declined.

In January 2003, Fleming started his own mosquito business, TMC Worldwide, L.P., to service south Texas residents. During the first quarter of 2003, Fleming became aware of the fact that Gray possessed Champions's customer list. Fleming asked to see the list, but Gray would not let him. In November 2003, Fleming bought Champions's assets, including its customer list that contained more than 3000 names from across the United States.

In February 2004, Fleming received a telephone call from Mrs. Orloff, one of Fleming's customers, who informed him that she had received a letter from Gray. Mrs. Orloff faxed a copy of the letter to Fleming. The letter was generically addressed to "Resident," stated the various services offered by Gray's company, and offered a price for insecticide refills that was less than TMC's price. Fleming kept Mrs. Orloff as his customer by offering her a discount on the price of her insecticide refills. Fleming also testified that he later learned of at least one former Champions client, Mrs. West, who was now using Gray's services.

TMC filed suit, in which it alleged that Gray had breached his confidentiality agreement by using trade secrets—TMC's

---

**2.** Atkinson also testified that the confidentiality agreement had no geographic provision.

**3.** Gray testified that he never asked for the customer list and was never told what to do with the list. He testified that the customer list included customers throughout the United States. He also testified that his job did not require him to make "cold calls." He was only to follow the "leads" provided by the company.

customer list—and by actively soliciting TMC's customers in violation of the non-compete clause. TMC also alleged that Gray misappropriated trade secrets. In its petition, TMC sought a temporary restraining order, a temporary injunction, and a permanent injunction. Gray's confidentiality agreement with AICE and a solicitation letter from Gray on AAMC letterhead were attached as exhibits to the petition.

In his answer, Gray generally denied the allegations and specifically stated that the covenant not to compete was unenforceable because (1) there was no separate enforceable agreement as is required by Texas Business and Commerce Code section 15.50(a),[4] (2) Gray was an at-will employee, and (3) there was no geographic restriction in the covenant not to compete and no reasonable limitation on the scope of the activities to be restrained. Gray further denied misappropriating any trade secrets.

Three months after denying the temporary injunction and two weeks after TMC filed its appellate brief, the trial court issued the following combined findings of fact and conclusions of law.

1. Richard Gray, ("Gray"), executed a Confidentiality Agreement (the "Agreement") with Automatic Insect Control Enterprises, Inc. ("AICE") on or about June 10, 2001.

2. *Gray was first given confidential information in the form of the AICE customer list ("Customer List") in June 2002, an entire year after the execution of the Agreement.*

3. The restrictions in the Agreement were not reasonably limited.

4. There is no geographic restriction in the Agreement.

5. The Customer List contains customers located in most states in the United States.

6. The restrictions in the Agreement are not a reasonable limitation on the scope of activity to be restrained and the Agreement's limitations did impose a greater restraint than was necessary to protect AICE's business interests.

7. There was no separate, enforceable agreement between AICE and Gray for the primary purpose of obligating the [sic] Gray to render personal services.

8. In the alternative, AICE and Gray had an at-will, verbal commissioned sales agreement for Gray to provide sales services to AICE.

9. AICE's former owner, Glen Atkinson ("Atkinson") provided the Customer List to all contract sales personnel and at least one installation personnel.

10. The Customer List was not marked "CONFIDENTIAL."

11. Out–of–Date issues of the Customer List were not collected and/or destroyed by Atkinson or any other officer or employee of AICE.

12. AICE nor Atkinson made any effort to collect the Customer List

---

**4.** Texas Business and Commerce Code section 15.50(a) provides that

Notwithstanding Section 15.05 of this code, a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM.CODE ANN. § 15.50 (Vernon 2002).

from personnel or contractors who left employment with AICE.

13. Atkinson knew that Gray was competing with AICE at least as early as April/May 2003.

14. *It is not known whether the 16 customers common to the Customer List and Gray's customer list were solicited by Gray, or sought Gray out because of a prior relationship with Gray.*

15. TMC Worldwide, L.P. ("TMC") purchased the assets of AICE.

16. TMC's General Partner is John Fleming ("Fleming").

17. Fleming was aware of the Customer List in Gray's possession before TMC acquired the assets of AICE.

18. Fleming requested a copy of the Customer List in Gray's possession, from Gray, before TMC acquired the assets of AICE.

19. Atkinson took no or insufficient action that would indicate a concern for protecting the distributed copies of the Customer List.

20. The Agreement does not comport with the covenant not to compete provisions of Tex. Bus. Com.Code §§ 15.50–15.52[.]

21. AICE's promise to provide proprietary information to Gray is illusory because there was no separate, enforceable agreement for the primary purpose of obligating the [sic] Gray to render personal services.

22. An at-will services agreement cannot be an enforceable agreement for purposes of enforcing a covenant not to compete because the parties always retain the option of discontinuing services for any reason.

23. Injunctive relief may be based on the application of general equitable principles or on express authorization contained in a statute.

24. Procedures governing courts of equity are controlling as long as they are not in conflict with Texas statutes or rules of procedure.

25. In the absence of an enforceable agreement not to compete, TMC is not entitled to an injunction preventing Gray from soliciting clients with whom Gray established a relationship during his tenure with AICE.

26. TMC must establish that the Customer List is entitled to trade secret protection until the trial on the merits.

27. To establish that the Customer List is entitled to trade secret protection until the trial on the merits, TMC must show a probability of success in proving that the Customer List is entitled to trade secret protection.

28. TMC did not show a probability of success in proving that the Customer List is entitled to trade secret protection pending trial on the merits because of 1) the extent to which the Customer List was known by employees and others involved in the business, 2) the lack of measures taken by AICE to guard the secrecy of the Customer List, and 3) the ease or difficulty with which the Customer List could be properly acquired or duplicated by others.

(Emphasis added.) TMC does not challenge specific findings of fact. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex.1986) (holding unchallenged findings of fact are binding unless contrary is established as matter of law or there is no evidence to support finding); *Aldine Indep. Sch. Dist. v. Ogg,* 122 S.W.3d 257, 265

(Tex.App.-Houston [1st Dist.] 2003, no pet.).

### Temporary Injunction

In two points of error, TMC argues that the trial court abused its discretion by not enjoining Gray from (1) continuing to use TMC's trade secrets in competition with TMC and (2) continuing to compete against TMC in violation of Gray's covenant not to compete.

■■■ A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex.1993). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Id.* To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Id.*

■■■ The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court, and the court's ruling is subject to reversal only for a clear abuse of discretion. *Walling*, 863 S.W.2d at 58. We must not substitute our judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Johnson v. Fourth Ct. App.*, 700 S.W.2d 916, 918 (Tex.1985). In reviewing an order granting or denying a temporary injunction, we draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment. *CRC–Evans Pipeline Int'l v.*

*Myers*, 927 S.W.2d 259, 262 (Tex.App.-Houston [1st Dist.] 1996, no writ). Abuse of discretion does not exist if the trial court heard conflicting evidence, and evidence appears in the record that reasonably supports the trial court's decision. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Myers*, 927 S.W.2d at 262. When, as here, specific findings of fact and conclusions of law are filed and a statement of facts is before the appellate court, the findings will be sustained if there is evidence to support them, and the appellate court will review the legal conclusions drawn from the facts found to determine their correctness. *See Myers*, 927 S.W.2d at 263.

### Non–Compete

In point of error two, TMC contends that the trial court abused its discretion by failing to enjoin Gray from continuing to compete against TMC in violation of Gray's covenant not to compete. We disagree.

■■■ The Covenants Not to Compete Act, Texas Business and Commerce Code Annotated sections 15.50–.52 (Vernon 2002), governs the enforceability of the involved covenant not to compete, as well as the procedures and remedies in an action such as this one. *See Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642, 644 (Tex.1994). The enforceability of a covenant not to compete is a question of law for the court. *Id.*

■■■ Section 15.50 reads in relevant part:

[A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reason-

able and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM.CODE ANN. § 15.50(b) (Vernon 2002). In the present case, we are concerned only with the first of the two criteria for enforceability of a covenant not to compete—whether the covenant not to compete involved here was "ancillary to or part of an otherwise enforceable agreement at the time the agreement [was] made." Under section 15.50, the relevant point in time is *the moment the agreement is made;* the issue is whether, "at the time the agreement is made," there exists other mutually binding promises to which the covenant not to compete is ancillary or part and parcel. *Light,* 883 S.W.2d at 644.

■ Gray was an "at-will" employee of Champions. An "otherwise enforceable agreement" can emanate from at-will employment, but only so long as the consideration for a promise is not dependent on a period of continued employment. *Myers,* 927 S.W.2d at 263. A promise dependent on a period of continued employment would be illusory because it fails to bind the promisor, who always retains the option of discontinuing employment in lieu of performance. *Light,* 883 S.W.2d at 644–45.[5]

■ An "otherwise enforceable agreement" is a contract and, as such, must be supported by consideration. *Tom James of Dallas, Inc. v. Cobb,* 109 S.W.3d 877, 885 (Tex.App.-Dallas 2003, no pet.). "Consideration is a *present* exchange bargained for in return for a promise. It consists of either a benefit to the promisor or detriment to the promisee." *Roark v. Stallworth Oil & Gas, Inc.* 813 S.W.2d 492, 496 (Tex.1991) (emphasis added) (internal citations omitted).

■ There must be a contemporaneous exchange of consideration between the parties at the time the "otherwise enforceable agreement" is executed for the promise not to be illusory. *See id.* Under section 15.50, the time relevant to this determination "is the moment the agreement is made; the issue is whether, 'at the time the agreement is made,' there exists other mutually binding promises to which the covenant not to compete is ancillary or part and parcel." *Myers,* 927 S.W.2d at 263; *see Light,* 883 S.W.2d at 644–45. The fact that Atkinson gave new confidential information and training to Gray some time after entering into the agreement will not suffice; we must evaluate the consideration given at the time the agreement was made. *See Olander v. Compass Bank,* 172 F.Supp.2d 846, 854 (S.D.Tex.2001). When we evaluate the agreement at the time it was made, Champions' provision of confidential information and training to Gray before signing the agreement will not support its promises in the agreement. *See Roark,* 813 S.W.2d at 496 ("Consideration is a *present* exchange bargained for in return for a promise." (Emphasis added.)); *see also* Jordan Leibman & Richard Nathan, *The Enforceability of Post-employment Noncompetition Agreements Formed After At-will Employment Has Commenced: The "Afterthought" Agreement,* 60 S. CAL. L.REV. 1465, 1528–29 (1987) ("If anything in the classical law of contracts is clear, it is that past [or future]

---

5. For instance, a promise of a raise in wages to an at-will employee is illusory because it is dependent upon some period of continued employment; the employer could fire the employee and be under no obligation to perform the promise. *Light,* 883 S.W.2d at 645 n. 5.

In contrast, a promise to give 14–days written notice to terminate employment, or to provide an inventory upon termination, would not be "illusory" because it binds the promisor even though employment ends. *Id.* at 646.

consideration is not good consideration. Any exchange has to be contemporaneous by definition, because the promise and the consideration for that promise must serve as reciprocal conventional inducements.").

██ A *promise* to give confidential information is not sufficient. *Light,* 883 S.W.2d at 647 n. 14. The employer must actually give the confidential information in return for the employee's promise not to disclose it. The Texas Supreme Court stated in *Light* that, "if an employer *gives* an employee confidential and proprietary information or trade secrets in exchange for the employee's promise not to disclose them, and the parties enter into a covenant not to compete, the covenant is ancillary to an otherwise enforceable agreement." *Light,* 883 S.W.2d at 647 n. 14 (emphasis added).

██ Accordingly, a promise to provide confidential information is illusory and cannot be the basis of an "otherwise enforceable agreement" unless (1) the employer promises to deliver the confidential information to the employee and (2) the employer actually delivers the confidential information at or near the time the employee makes the promise to keep the information confidential. *See Wright v. Sport Supply Group, Inc.* 137 S.W.3d 289, 297 (Tex.App.-Beaumont 2004, no pet.) (court found that employer's promise to provide confidential information was not illusory where, subsequent to signing the agreement, the employer, on a daily basis, made confidential information available to the employee.) [6] We only need to find one non-illusory promise to establish an otherwise enforceable contract.

██ In this case, TMC asserts that Champions' promise to provide Gray with confidential information in return for his promise to keep the information confidential was non-illusory and thus was the basis of an "otherwise enforceable" contract that was ancillary to the covenant not to compete. However, Gray testified that he did not receive this confidential information until *one year after* he started working for Champions. The trial court believed this testimony and made findings of fact consistent with Gray's recollection of the events. Because the record reflects that there was no contemporaneous exchange of consideration for the contract— the confidential information was not provided close to the time that the agreement was made—Champions' promise was illusory and, thus, cannot be the basis of an otherwise enforceable contract ancillary to the covenant. See *Roark,* 813 S.W.2d at 496; *Wright,* 137 S.W.3d at 297.

In support of its argument, TMC relies on the holdings in *Ireland v. Franklin,* 950 S.W.2d 155 (Tex.App.-San Antonio 1997, no writ) and *Curtis v. Ziff Energy Group, Ltd.,* 12 S.W.3d 114 (Tex.App.-Houston [14th Dist.] 1999, no pet.). This reliance is misplaced because neither opinion discusses the issue of whether and to what extent the employer's delay in complying with a promise to deliver confidential information will render the promise illusory. To the extent that these opinions can be read to hold that, in an at-will employment relationship, there is no requirement that the consideration be contemporaneously exchanged to make a promise to provide

---

**6.** *Cf. Strickland v. Medtronic, Inc.* 97 S.W.3d 835, 839 (Tex.App.-Dallas 2003) (pet. dism'd w.o.j.) (court found that, in the context of an at-will employment relationship, a *promise to provide* an employee with confidential information is inherently an illusory promise and cannot be the basis of an otherwise enforceable contract. The court noted that this promise necessarily depends on an additional period of employment, and an employer could always terminate the employee without providing the promised confidential information.)

confidential information not illusory, we decline to follow these opinions.

Accordingly, we hold that the trial court did not abuse its discretion in denying TMC's temporary injunction relating to the covenant not to compete. We overrule point of error two.

**Trade Secrets**

■ In its first point of error, TMC argues that the trial court abused its discretion by not enjoining Gray from continuing to use TMC's trade secrets—the customer list—in competition with TMC. We disagree.

Gray provided AAMC's customer list, which contained approximately 80 names, 16 of which were also found on TMC's list. Gray testified that he obtained the customers through his relationship with builders and landscaping companies who gave him references. He also testified that he received some referrals from other customers and from Terry Clark, a former Champions installer, and Don Carlson, a former Champions salesperson. He testified that some of his customers sought him out because of his prior relationship with them and because they were dissatisfied with the service provided by TMC. Gray testified that Mrs. West, a former Champions client, was one such customer. Notably, TMC *does not challenge* the trial court's finding that it was unknown if the 16 customers common to TMC's list and Gray's customer list were solicited by Gray through his use of Champions' customer list or if they sought Gray out because of a prior relationship with him. Gray testified that he has not shared the Champions list with anyone, he has not made any copies of the list, the list is currently in the possession of his attorney, and no one has asked him to return it.

In contrast, Fleming testified that, on December 10, 2003, two days after he bought Champions, he met with Gray. Fleming testified that Gray was angered by the news of Fleming's decision to purchase Champions, and he informed Fleming that he had already "taken over a hundred customers from Champions," and that "[Gray's] goal was to take one hundred customers a year" and increase it to "approximately 500 a year."

Fleming testified that Gray told him that he had Champions' customer list and that "he would do with it whatever he blank well pleased." Fleming also testified that Gray told him that he was going to use the Champions list as a guide to target neighborhoods for mass mailings. Fleming said that, at the December 10th meeting, he requested that Gray not use the list in direct competition with Fleming.[7] Fleming testified that, after he purchased Champions, he asked Gray for the list and Gray never returned the list to him.

At the temporary injunction hearing, Fleming provided evidence that only one of TMC's 3000 customers, Mrs. Orloff, had received a mass mailing from Gray, and he testified that Orloff is still a TMC customer. Fleming also testified that he "lost" Mrs. West to Gray as a customer because she was unhappy with TMC's service.

---

7. Gray testified that, before the December 10th meeting, Fleming had an agreement with him to buy some equipment from Gray and serve as his distributor. Gray also testified that he spent about $22,000 buying mosquito product from Fleming. Gray testified that, at the meeting, Fleming informed him of his purchase of Champions and that Fleming wanted to continue his business relationship with Gray. Gray testified that he told Fleming that he did not want to continue to do business with Fleming because Fleming was now in direct competition with Gray. Gray testified that this competition was in violation of an unwritten business agreement between them.

In light of the conflicting testimony regarding Gray's conduct and the lack of any evidence that Gray used the Champions customer list to obtain the 16 customers that are common to both Gray's list and TMC's list, we hold that the trial court did not abuse its discretion in denying TMC's temporary injunction relating to the alleged trade secrets. *See Wright,* 137 S.W.3d at 292 ("The trial court does not abuse its discretion when basing its decision on conflicting evidence, nor does it abuse its discretion so long as some evidence of substantive and probative character exists to support its decision.") The trial court did not abuse its discretion when it found that "TMC did not show a probability of success in proving that the Customer List is entitled to trade secret protection pending trial on the merits." *See Butnaru,* 84 S.W.3d at 204. We overrule point of error one.

### Conclusion

We affirm the trial court's denial of the temporary injunction.