Opinion issued March 1, 2016



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00319-CV

_____

## Q'MAX AMERICA, INC. D/B/A Q'MAX AMERICA SOLUTIONS, INC. D/B/A Q'MAX SOLUTIONS D/B/A Q'MAX SOLUTIONS, INC., Appellant

## V.

## SCREEN LOGIX, LLC, Appellee

On Appeal from the 125th District Court
Harris County, Texas
Trial Court Case No. 2015-05002

## MEMORANDUM OPINION

Screen Logix, LLC sued Jack Baker, David Schulte, Jr., and Q'Max America, Inc. d/b/a Q'Max America Solutions, Inc. d/b/a Q'Max Solutions d/b/a Q'Max Solutions, Inc., alleging that Schulte and Baker, former employees and officers of Screen Logix, conspired with Q'Max to misappropriate Screen Logix's trade secrets

and confidential information via a consulting agreement to assist Q'Max in building a shaker screen manufacturing facility. Screen Logix sued and sought a temporary injunction enjoining Schulte and Baker from performing under the consulting agreement, and the trial court granted relief.

In this interlocutory appeal, Q'Max argues that the trial court abused its discretion in entering the temporary injunction because (1) the alleged usurpation of the Q'Max "business opportunity" happened in the past and therefore Screen Logix could not demonstrate that it threatened imminent and irreparable harm, (2) Screen Logix did not demonstrate that it had a probable right to relief on its breach of fiduciary duty claim because Screen Logix did not demonstrate that the consulting agreement constituted a "business opportunity" that belonged to it, and (3) the temporary injunction is overbroad because it completely restricts Schulte and Baker from performing under the consulting agreement.[1] We affirm.

**Background**

Screen Logix manufactures shaker screens, which are used to separate impurities from drilling mud after it is pumped into the ground and back out again for re-use. From December 2009 to January 2014, Schulte served as Screen Logix's Vice President of Engineering and Baker served as Screen Logix's Vice President

---

[1] Schulte and Baker have not appealed.

of Sales.  Both Schulte and Baker had written employment agreements.[2]  Relevant to the underlying dispute, the agreements provided that Schulte and Baker must present to Screen Logix in writing any business opportunities related to or connected to Screen Logix's business:

> Business Opportunities.  For as long as the Employee shall be employed by the Employer and thereafter with respect to any business opportunities learned about during the time of the Employee's employment by the Employer, the Employee agrees that with respect to any future business opportunity or other new and future business proposal which is offered to, or comes to the attention of the Employee during the Term of this Agreement or any renewal term thereof, and which is specifically related to, or connected with, the Business, the Employer shall have the right to take advantage of such business opportunity or other business proposal for its own benefit. The Employee agrees to promptly deliver notice to the Board in writing of the existence of such opportunity or proposal, and the Employee may take advantage of such opportunity only if the Employer does not elect to exercise its right to take advantage of such opportunity.

Also relevant to the underlying dispute, the agreements prohibited Schulte and Baker from disclosing Screen Logix's confidential information:

> Confidential Information.  The Employee acknowledges that in the course of his employment with the Employer, he may receive certain trade secrets, know-how, lists of customers, employee records and other confidential information and knowledge concerning the Business ("Confidential Information"), which the Employer desires to protect. The Employee understands that such Confidential Information is confidential and agrees not reveal [sic] such Confidential Information to anyone outside the Employer.  The Employee further agrees not to use such Confidential Information during the term of this Agreement and thereafter to compete with the Employer.  Upon termination of this

---

[2]     The two agreements are identical in all relevant respects.

Agreement, the Employee shall surrender to the Employer all papers, documents, writings, and other property produced by him or coming into his possession by or through this Agreement and relating to the information referred to in this Section . . ., which are not general knowledge in the industry, and the Employee agrees that all such materials will at all times remain the property of the Employer.

Schulte and Baker also each signed a separate Memorandum of Agreement Regarding Invention and Confidential Information in which they agreed not to disclose Screen Logix's confidential information and agreed that all information regarding Screen Logix's business, including "technical data, cost estimates, proposals, forecasts, financial data, general correspondence, and the scope, the content or the results of research and development work" was presumed confidential.

Q'Max sold shaker screens bearing the Q'Max label, but which were not manufactured by Q'Max. Q'Max, however, was interested in building its own manufacturing facility to produce its own shaker screens. In October 2014, Simon Tyldsley, a director of operations at Q'Max, approached Schulte and Baker about assisting Q'Max with building a shaker screen manufacturing facility in Dubai. Shortly after their discussion, Baker emailed Tyldsley and told him "[i]n regards to screen facility, keep that between us and your top management."

Baker testified at the temporary injunction hearing that he and Schulte told the president of Screen Logix, Jeff Walker, about Q'Max's proposal to build a plant, and that Walker said Screen Logix was not interested. But Walker disputed that; he testified that he knew nothing about the proposal until after Schulte and Baker had

4

left Screen Logix. It is undisputed that the Q'Max opportunity was never presented to Screen Logix in writing.

On November 4, 2014, Tyldsley, Schulte, Baker, and a Q'Max Vice President, Pete Mackenzie, had dinner together in Houston. At the dinner, the men discussed Schulte and Baker helping Q'Max build the Dubai manufacturing facility and manufacture and sell screens. The following day, Schulte used his personal email account to send Tyldsley and Mackenzie two documents, one titled "Key Employees" and the other a "Startup List Given to QMAX." Baker prepared the "Key Employees" list, which described Baker's and Schulte's goals in joining Q'Max. The "startup list," prepared by Schulte, contained detailed cost breakdowns and projections for the first three years of operation at the proposed Q'Max plant.

A few days after the dinner, Schulte and Baker traveled to Dubai to meet with Q'Max. Schulte and Baker secured a $140,000 order from Q'Max for screens from Screen Logix, but also discussed leaving Screen Logix to assist Q'Max in building the manufacturing facility. After returning from Dubai, Schulte sent a "rough draft of contract for the technology"—a draft consulting agreement delineating Schulte's and Baker's responsibilities with respect to the Dubai facility—to Tyldsley and to Baker at Baker's wife's personal email address. [3]

---

[3] Schulte and Baker did not use their Screen Logix email accounts to communicate about the Q'Max manufacturing facility. Schulte used his personal email account, and Baker used his wife's personal account.

A week later, Schulte sent Tyldsley and Baker an email regarding "Information Required from Legal Dept." Among other things, Schulte wrote "Many people manufacture screens, but none have been able to exceed the quality of the products we designed, but we can. We will teach this process to your employees." Schulte also emphasized the "urgency" with which he and Baker needed to get a signed contract from Q'Max because their current employment agreements would expire soon and they did not want to walk away "without a contract in hand."

On December 11, 2014, in response to Tyldsley's question regarding whether Q'Max should wait to make changes to the consulting agreement until after Schulte's and Baker's lawyers reviewed the draft, Schulte responded, "Please don't wait, timing is critical." He also noted that "[a] start date of Jan 15th as you had proposed would be better for us than Jan 2nd at this point. It will allow us to spread out our departures from present company."

On December 12, 2014, Schulte resigned from Screen Logix, effective January 11, 2015. On December 15, 2015, Schulte and Baker signed the consulting agreement with Q'Max effective January 2, 2015. The agreement provided for staggered payments beginning with an initial payment of $300,000 and totaling $1 million in exchange for their assistance in building the Dubai facility and

6

manufacturing and selling screens. Schulte and Baker also would each receive $15,000 per month for the duration of the agreement.

Schulte's resignation from Screen Logix was effective January 11, 2015, and Baker resigned effective January 12, 2015. Neither informed Screen Logix that he was leaving to assist Q'Max with the building and running of a shaker screen manufacturing facility.

On January 22, 2015, an executive assistant at Q'Max inadvertently emailed a copy of the invoice for the initial $300,000 consulting agreement payment to the Screen Logix Operations Manager. A week later, Screen Logix sued Baker, Schulte, and Q'Max, asserting claims for breach of contract, breach of a covenant not to compete, breach of fiduciary duty, tortious interference with employment contracts, misappropriation of trade secrets, civil conspiracy and fraud. Screen Logix subsequently sought a temporary injunction prohibiting Schulte and Baker from performing under the consulting agreement until trial.

The trial court granted the temporary injunction, stating in its order:

Screen Logix has pled and proven a probable, imminent, and irreparable injury from prior to the February 24, 2015 Temporary Restraining Order, until trial on the merits. If the Court does not issue the temporary injunction order, Screen Logix will be imminently and irreparably injured because without such relief, Schulte and Baker may and probably will misappropriate and disseminate the rights and property of Screen Logix to Q'Max and other third parties, with whom Screen Logix has no confidentiality agreement. Screen Logix as no adequate remedy at law because the amount of the resulting damages from Baker's and Schulte's use, revealing, misappropriating and

dissemination of trade secrets and confidential information owned by Screen Logix will be difficult, if not impossible, to fully and accurately assess.

Among other things, the order prohibited Schulte and Baker from

Performing in any way [their] duties or services under the Consulting Agreement, fully described above in relevant part; and/or providing Q'Max with improved mesh combinations, structural designs, and equipment designs; and/or training Q'Max'[s] sales force to market shaker screens; because all (1) such duties or services require Schulte and Baker to use, reveal, or disclose trade secrets or confidential information owned by Screen Logix; and (2) the Q'Max Opportunity belonged to Screen Logix.

Q'Max appealed.

## Jurisdiction

Screen Logix re-urges in its appellate brief an argument first made in an earlier motion to dismiss that this Court denied—that Q'Max does not have standing to appeal the temporary injunction because it enjoins Schulte and Baker only, and not Q'Max. We address this argument first because it implicates our jurisdiction. *See Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004) (standing is a component of subject-matter jurisdiction).

An appellant need not be a party to a temporary injunction in order to have standing to appeal it, so long as the appellant is personally aggrieved by the entry of the temporary injunction and therefore, has a justiciable interest in the controversy. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (authorizing a "person" to appeal from the grant or denial of a temporary injunction); *Nootsie, Ltd. v.*

8

*Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996) (issue of standing concerns whether a person was personally aggrieved and, therefore, has a justiciable interest in controversy); *In re B.I.V.*, 923 S.W.2d 573, 574 (Tex. 1996) (to establish standing, appellant must show personal stake in controversy); *see also Landry v. Burge*, No. 05-99-01217-CV, 2000 WL 1456471, at *4 (Tex. App.—Dallas 2000, no pet.) (not designated for publication) (non-parties that are personally aggrieved by temporary injunction have standing to appeal). Here, the temporary injunction prohibits Schulte and Baker from performing their agreement with Q'Max. Thus, Q'Max, as the contractual counterparty to the enjoined parties, is personally aggrieved by the entry of the temporary injunction. We therefore hold that Q'Max has standing to appeal the temporary injunction and that we have jurisdiction over the appeal. *See Bell v. Craig*, 555 S.W.2d 210, 211–12 (Tex. App.—Dallas 1977, no writ) (party adversely affected by temporary injunction had standing to appeal despite fact that order did not expressly enjoin him from doing anything).

## Discussion

In two issues, Q'Max contends that the trial court erred in granting the temporary injunction because (1) the alleged usurpation of the Q'Max "business opportunity" happened in the past and therefore Screen Logix could not demonstrate that it threatened imminent and irreparable harm, (2) Screen Logix did not demonstrate that it had a probable right to relief on its breach of fiduciary duty claim

9

because Screen Logix did not demonstrate that the consulting agreement constituted a "business opportunity" that belonged to it, and (3) the injunction is overbroad because it completely prohibits Schulte and Baker from performing the consulting agreement.

## A. Standard of Review

The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court, and the court's ruling is subject to reversal only for a clear abuse of discretion. *TMC Worldwide, L.P. v. Gray*, 178 S.W.3d 29, 36 (Tex. App.—Houston [1st Dist.] 2005, no pet.). We do not substitute our judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Id.* (citing *Johnson v. Fourth Ct. App.*, 700 S.W.2d 916, 918 (Tex. 1985), *disapproved in part on other grounds by In re Columbia Med. Ctr.*, 290 S.W.3d 204 (Tex. 2009)). In reviewing an order granting or denying a temporary injunction, we draw all legitimate inferences from the evidence in a manner most favorable to the trial court's order. *Id.* (citing *CRC–Evans Pipeline Int'l v. Myers*, 927 S.W.2d 259, 262 (Tex. App.—Houston [1st Dist.] 1996, no writ)). Abuse of discretion does not exist if the trial court heard conflicting evidence and evidence appears in the record that reasonably supports the trial court's decision. *Id.* (citing *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Myers*, 927 S.W.2d at 262).

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Id.* at 36 (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993). To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.* (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)).

## B.     Q'Max's "Business Opportunity Theory" Arguments

In its first issue, Q'Max argues that the temporary injunction must be dissolved in part because "[t]emporary injunctive relief could not properly have been based on the theory that Mr. Schulte and Mr. Baker usurped a 'Business Opportunity' by agreeing to provide consulting services, because no imminent or irreparable harm could be threatened by this past event." Q'Max also argues that Screen Logix did not establish a probable right to relief on its breach of fiduciary duty claim because Screen Logix did not demonstrate that the consulting agreement constituted a "business opportunity" that belonged to it. Q'Max concludes that "the trial court's order granting temporary injunctive relief on this [business opportunity] theory must be reversed and the temporary injunction dissolved in part." Q'Max does not specify which portions of the injunction should be reversed.

11

### 1. Probable, imminent, and irreparable injury

Q'Max's argument with respect to probable, imminent, and irreparable injury, in essence, is that because the consulting agreement was signed in the past, any harm caused by the usurpation of this "business opportunity" occurred in the past at the moment the agreement was signed. Thus, Q'Max argues, Screen Logix did not demonstrate that it was probable that it would be imminently and irreparably injured between the time the injunction was entered and trial, as required to support the entry of a temporary injunction. *See Gray*, 178 S.W.3d at 36 (to support entry of temporary injunction, movant must show, among other things, probable, imminent, and irreparable injury before trial on the merits).

But with respect to imminent and irreparable injury, the temporary injunction order states:

> Screen Logix has pled and proven a probable, imminent, and irreparable injury from prior to the February 24, 2015 Temporary Restraining Order, until trial on the merits. If the Court does not issue the temporary injunction order, Screen Logix will be imminently and irreparably injured because without such relief, Schulte and Baker may and probably will misappropriate and disseminate the rights and property of Screen Logix to Q'Max and other third parties, with whom Screen Logix has no confidentiality agreement. Screen Logix as no adequate remedy at law because the amount of the resulting damages from Baker's and Schulte's use, revealing, misappropriating and dissemination of trade secrets and confidential information owned by Screen Logix will be difficult, if not impossible, to fully and accurately assess.

Thus, the probable, imminent, and irreparable injury identified by the trial court was the likely disclosure of Screen Logix's trade secrets and confidential information as a result of Schulte's and Baker's performance of the consulting agreement—not the usurpation of the Q'Max opportunity and associated consulting fees, which while factually related, is a separate potential injury. Q'Max does not challenge the trial court's finding of probable injury based upon disclosure of confidential information. Accordingly, Q'Max has not demonstrated that the trial court abused its discretion in finding that Screen Logix demonstrated a probable, imminent, and irreparable injury. *See Gray*, 178 S.W.3d at 36.

### 2.    Probable right to relief

The trial court found that "Screen Logix has shown a probable right on final trial to the relief sought." Q'Max singles out Screen Logix's breach of fiduciary duty claim and argues that Screen Logix did not establish a probable right to relief on this claim because Screen Logix did not demonstrate that the Q'Max consulting agreement constituted a business opportunity that belonged to Screen Logix. But even if Q'Max is correct, Screen Logix asserted a number of claims in addition to breach of fiduciary duty. Q'Max does not contend that the trial court erred in finding that Screen Logix had a probable right to relief on any claim other than the breach of fiduciary duty claim. Thus, even if Q'Max were correct and Screen Logix did not demonstrate a probable right to relief on this claim, there are other claims as to which

the trial court reasonably could have found that Screen Logix established a probable right to relief.

Moreover, Q'Max's argument that Screen Logix did not demonstrate that the Q'Max consulting agreement was a business opportunity that belonged to Screen Logix is based on Q'Max's premise that building shaker screen manufacturing facilities was not part of Screen Logix's business. The employment agreements defined Screen Logix's "business" as "the manufacturing and sale of drilling shaker screens and fluid cleaning systems used in the drilling of oil and gas wells, and other associated equipment." Q'Max contends that building shaker screen manufacturing facilities is not part of the business of manufacturing shaker screens, but the employment agreement's definition of "business" does not compel this conclusion. Indeed, at the temporary injunction hearing, Screen Logix adduced evidence that it has built several shaker screen manufacturing facilities in the recent past. Moreover, the consulting agreement contemplated Schulte and Baker not only assisting with the construction of the facility, but also with the manufacturing and sale of shaker screens, which is indisputably part of Screen Logix's business.

Q'Max also contends that Screen Logix "cannot credibly claim it could or would have seized on the opportunity to provide consulting services" to Q'Max. Q'Max points to Baker's and Schulte's claims that Walker knew about it and declined to pursue it. Q'Max also points out that Screen Logix had previously

14

declined to build a different shaker screen manufacturing facility in the Middle East and was attempting to sell the company. However, Walker testified that Screen Logix would have availed itself of the Q'Max opportunity if it had been made aware of it. Questions of credibility are left to the trial court alone, and we will not find that the trial court abused its discretion in entering an injunction based on its resolution of a conflict in the evidence. *See Gray*, 178 S.W.3d at 36.

We overrule Q'Max's first issue.

## C. Scope of Injunction

In its second issue, Q'Max argues that the injunction is impermissibly broad because it completely prohibits Schulte and Baker from performing the consulting agreement. Q'Max argues that the injunction should only have prohibited Schulte and Baker from using protected Screen Logix information and trade secrets in their performance of the consulting agreement.

For purposes of this appeal, Q'Max does not challenge the trial court's finding that Schulte and Baker possessed Screen Logix's trade secrets and confidential information. The trial court found that if Schulte and Baker were not enjoined from performing the consulting agreement, they "may and probably will misappropriate and disseminate the rights and property of Screen Logix to Q'Max." Drawing all legitimate inferences from the evidence in a manner most favorable to the trial court's order, we conclude that the trial court did not abuse its discretion in enjoining

15

Schulte and Baker from performing the consulting agreement because the evidence reasonably supports a conclusion that the agreement likely could not be performed unless Schulte and Baker misappropriated Screen Logix's trade secrets and confidential information.

Considerable record evidence supports this conclusion. For example, in an email to Q'Max, Schulte referred to a draft of the consulting agreement as a "rough draft of contract for the technology." Schulte also produced a USB drive containing 9,060 files in response to Screen Logix's post-resignation request that he "return documents to Screen Logix obtained during his employment." Walker testified that "hundreds" of the 9,060 documents were proprietary and confidential and that Screen Logix had no business reason for Schulte to have these documents on his personal computer. Among other things, the drive contained electronic copies of engineering drawings that belonged to Screen Logix, which Schulte admitted that he had transferred to his personal laptop before resigning. The drive also contained a Screen Logix presentation setting out a detailed budget and other information for a proposed Middle East shaker screen manufacturing facility.

A forensic analysis of Schulte's and Baker's Screen Logix laptops revealed that, during the negotiation period with Q'Max and before their resignations, both had accessed files that contained information related to Screen Logix's past proposal to build the shaker screen manufacturing facility in the Middle East, as well as

16

budgetary information and information regarding screen specifications and prices. The computer analyst testified that Schulte on average had accessed less than one document per day between April 2014 and January 2015, but that his behavior significantly changed during the period that Schulte and Baker were negotiating the Q'Max consulting agreement and preparing to leave Screen Logix:

- On December 4, 2014, Schulte accessed 39 documents. That same day, he told Q'Max that "[t]here are no patents, trademarks, etc. on the designs of the products or the equipment used by current employer. . . . What we will be providing are improved mesh combinations that may or may not be patentable, slight improvements in structural design, and improved equipment design." Schulte also told Q'Max, "Many people manufacture screens, but none have been able to exceed the quality of the products we designed, but we can. We will teach this process to your employees."

- On December 12, 2014, the day Schulte submitted his resignation letter to Screen Logix, Schulte accessed 109 documents. Three days later, Schulte and Baker signed the Q'Max consulting agreement.

- On January 6, 2015, a week before Schulte's resignation was effective, he accessed 88 documents.

The record also reveals that on November 5, 2014, Schulte sent two documents to Q'Max regarding the proposed Dubai facility. One was a "Key Employees" list that Baker had prepared, which described Baker's and Schulte's goals in joining Q'Max. The other was a "startup list" containing detailed cost breakdowns and projections for the first three years of operation at the anticipated plant. Schulte denied using any Screen Logix information to prepare the cost breakdown and testified that he knew all of the numbers off of the top of his head.

17

Q'Max argues that conflicting evidence shows that Schulte and Baker did not need or intend to use Screen Logix's trade secrets and confidential information to perform the consulting agreement. Schulte testified that he only took the 9,060 documents in order to help another Screen Logix employee, in case that person had any questions after his resignation. Q'Max also points to evidence that Screen Logix makes some technical information regarding shaker screens available on the internet, that certain design specifications used by Screen Logix are similar to those used by its competitors, and that a competitor of Screen Logix copied one of Screen Logix's designs. Baker testified that Schulte's significant experience meant that he "could probably write a program any time of the day" to develop new mesh combinations, and Schulte testified that he planned on developing new mesh combinations. Walker testified that Screen Logix uses a proprietary adhesive method to produce the shaker screens, but acknowledged that it would be possible to reverse engineer the method with "a lot of trial and error."

But conflicting evidence does not establish that a trial court abused its discretion in entering a temporary injunction, because the resolution of conflicts in the evidence are left to the trial court's sound discretion. *See Gray*, 178 S.W.3d at 36. So long as evidence appears in the record that reasonably supports the trial court's decision, the presence of conflicting evidence is not a basis for reversing an injunction. *See id.* As detailed above, the record contains evidence supporting the

trial court's conclusion that performance of the consulting agreement by Schulte and Baker likely would result in disclosure of Screen Logix's trade secrets and confidential information.

Q'Max contends that the injunction in this case is like the injunction found overbroad in *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18 (Tex. App.—Houston [1st Dist.] 1998, no pet.). In *T-N-T*, the Terpstras, two former employees of Hennessey, which specialized in high performance upgrades for cars, started a competing business and solicited customers on the basis that they had learned how to create upgrade packages at Hennessey and could offer the same upgrades for less than Hennessey. *Id.* at 20. The trial court enjoined the Terpstras from:

> 1. directly or indirectly disclosing, using, selling or testing, for any purpose, (or imparting to any other person, firm, corporation or other entity) *any information* relating to the Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles; and

> 2. working on, designing, repairing, installing, testing, soliciting, contacting, accepting any business from and/or providing *any types of services* on any Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles, regardless of model year, except that Defendants may finish the work they were doing on the remaining Dodge Vipers owned by Ken Addington and Joe Bob Shirley.

*Id.* at 25 (emphasis in original). This court reformed the injunction to limit it to disclosure and use of trade secrets:

> 1. directly or indirectly disclosing, using, selling or testing, for any purpose, (or imparting to any other person, firm, corporation or other

entity) any ***Hennessey Trade Secret*** information relating to the Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles; and

2. working on, designing, repairing, installing, testing, soliciting, contacting, accepting any business from and/or providing any types of services using ***Hennessey Trade Secret information*** on any Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles, regardless of model year, except that Defendants may finish the work they were doing on the remaining Dodge Vipers owned by Ken Addington and Joe Bob Shirley.

*Id.* at 26. Q'Max argues that, like in *T-N-T*, Schulte and Baker should be enjoined only from using Screen Logix's trade secrets and confidential information, and not from any performance under the consulting agreement.

But the injunction in *T-N-T*, which was a general injunction that was not directed at any particular job or engagement, is not like the injunction here. The injunction in this case is directed at a particular consulting agreement, the performance of which the trial court found likely would result in the use and disclosure of Screen Logix's trade secrets. By its terms, the temporary injunction enjoins Schulte and Baker only from revealing or discussing confidential information and trade secrets which belong to Screen Logix, and the injunction further limits itself to information created or modified between the time of Screen Logix's inception in 2007 and January 12, 2015, which was the latter of Schulte's and Baker's final dates of employment with Screen Logix. Consequently, *T-N-T* is inapposite.

Accordingly, we conclude that the trial court did not abuse its discretion in enjoining Schulte and Baker from performing the consulting agreement pending a trial on the merits.

We overrule Q'Max's second issue.

## Conclusion

We affirm the trial court's temporary injunction order.


Rebeca Huddle
Justice

Panel consists of Justices Higley, Huddle, and Lloyd.