**Opinion issued June 28, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-16-00897-CV

———————————

**APMD HOLDINGS, INC., APMD, INC., CJT FINANCIAL INC., CJT MINING, INC., GREGORY MAYFIELD AND NEWELL FRED ANDERSON, Appellants**

**V.**

**PRAESIDIUM MEDICAL PROFESSIONAL LIABILITY INSURANCE COMPANY AND PRAESIDIUM ALLIANCE GROUP, LLC, Appellees**

---

On Appeal from the 113th District Court
Harris County, Texas
Trial Court Case No. 2012-21802

---

## O P I N I O N

In this case, appellees, Praesidium Medical Professional Liability Insurance

Company ("PMPLIC" or "the insurance company") and Praesidium Alliance Group,

LLC (collectively, "Praesidium"), sought to establish a medical malpractice liability insurance company incorporated in Delaware. Praesidium signed a "Memorandum of Agreement" with appellant APMD Holdings, Inc., which required, among other things, that APMD Holdings contribute 10 million shares of convertible preferred stock of Anderson Mining Corporation to serve as capital surplus for the insurance company. After the Delaware Department of Insurance ("DDOI" or "the Department") failed to approve the licensure of the insurance company, Praesidium sued APMD Holdings, Inc., APMD, Inc., CJT Financial, Inc., CJT Mining, Inc., Gregory Mayfield, and Newell Fred Anderson (collectively, "APMD") for breach of contract, fraud, and breach of fiduciary duty. After a bench trial, the trial court awarded $4,081,710 in damages to Praesidium, along with $342,000 in attorney's fees, post-judgment interest, and costs.

In six issues, APMD contends that (1) the trial court abused its discretion in granting final judgment against the defendants and finding that the Memorandum of Agreement was a valid and enforceable contract; (2) the Memorandum of Agreement was not breached by any party; (3) Praesidium Alliance Group did not suffer any damages; (4) the trial court abused its discretion in awarding legal damages; (5) the evidence was insufficient to establish fraud; and (6) the evidence was insufficient to establish breach of fiduciary duty.

We affirm.

## Background

Gary Schneidmiller, the chief executive officer of Praesidium Alliance Group ("Praesidium Alliance"), has worked in the insurance industry since the early 1970s, and he has extensive experience with medical malpractice insurance and insurance in the health-care context. In the early 2000s, he brought together experts from the medical, legal, and actuarial fields to create the Praesidium Guild, which had the goal of using a particular underwriting model to make medical malpractice insurance policies and premiums more equitable. Praesidium Alliance, an Ohio limited liability company, was formed out of the Praesidium Guild, and its ultimate goal was eventually to create an insurance company—PMPLIC—that would use Schneidmiller's underwriting model.

In preparation for creating PMPLIC, Schneidmiller consulted with numerous professionals in different fields, including legal experts, actuaries, incorporators, and experts concerning the Delaware insurance statutes. The only thing that Schneidmiller was missing was a source for the insurance company's capital surplus, a "long-term reservoir," which was required by the state to assure that the company's policyholders would be protected.

Around 2005 or 2006, Schneidmiller was introduced to Gregory Mayfield, one of the appellants in this case, who had business and financial experience. Mayfield became friends with both Schneidmiller and his son, Eric Schneidmiller,

3

and Mayfield worked toward securing financing for the insurance company's capital surplus. Mayfield became the chief executive officer of APMD Holdings, a mining company that, along with APMD, Inc., owned mining claims, primarily for gold and silver, on land in Nevada. Fred Anderson was the president of these companies. In August 2007, Mayfield notified the Schneidmillers that he had discovered a mechanism that could work for supplying the capital surplus: using convertible preferred shares of a corporation that could be redeemed by the corporation for cash if the insurance company needed to access its capital surplus. In a letter dated August 13, 2007, Mayfield told Eric Schneidmiller, Praesidium Alliance's chief operating officer, that because preferred stock is considered liquid securities, this financing scenario should be acceptable, "but we will need to have the approval of the State Insurance Commission before moving forward with this transaction."

Two weeks later, on August 27, 2007, Mayfield sent the following letter to Eric Schneidmiller:

> This shall confirm our oral agreement between us and Praesidium Alliance Group, LLC. . . .
>
> It is our intent to merge the respective resources with Praesidium Alliance Group, LLC to result in Praesidium Medical Professional Liability Insurance Company or such names as secures regulatory approval, which will be a Public Company with initial ownership at fifty-one percent (51%) PAG, LLC and forty-nine (49%) us. We shall provide Praesidium Medical Professional Liability Insurance Company with ten million (10,000,000) shares of Convertible Preferred Stock at a par value of five US dollars ($5.00) from Anderson Mining Corporation [APMD Holdings] as designated "Capital Surplus" of

4

Praesidium Medical Professional Liability Insurance Company. The net assets (assets in excess of Liabilities) of Anderson Mining Corp. exceed fifty million US dollars ($50,000,000) by many multiples and we shall entertain any reasonable assurances required by the responsible regulatory agency charged with supervision of Praesidium Medical Professional Liability Insurance Company, on or before the registration.

If all parties, including the regulatory agencies are in agreement, we shall commence the process of doing the formalities of the Stock issuance in the first week of October 2007. Our aim is to match Praesidium Alliance Group, LLC's target of commencing operations of Praesidium Medical Professional Liability Insurance Company this year.

Gary Schneidmiller testified that, upon being presented with Mayfield's August 2007 proposal, he researched APMD's business plan, the geologists who had certified the mining deposits, APMD's support staff, which included a prominent Houston law firm, and APMD's financial statements, which showed "2.2 billion on their books" and indicated that this amount would increase over time because APMD Holdings was still acquiring mining rights. Schneidmiller and his team at Praesidium Alliance were "satisfied that APMD was legitimate and that this was a legitimate offer." Schneidmiller had discussions with Anderson, in which Anderson told him about APMD's plans for a "very large acquisition" in the near future, and Praesidium Alliance ultimately decided to move forward with Mayfield's proposal.

On December 21, 2007, Schneidmiller, on behalf of Praesidium Alliance, and Mayfield, on behalf of APMD Holdings, signed a "Memorandum of Agreement" ("the Agreement"). The Agreement stated:

> **Whereas**, the ALLIANCE and APMD on August 27, 2007 agreed to merge their respective resources (as outlined in paragraph 2.A) to result in Praesidium Medical Professional Liability Insurance Company (hereinafter "CORPORATION"); and,
>
> **Whereas**, The CORPORATION is being prepared for incorporation in the State of Delaware as a stock company (C-Corporation); and,
>
> **Whereas**, the ALLIANCE and APMD wish to reduce to writing therein various oral agreements and written assurances to each other;
>
> NOW, THEREFORE, the parties do mutually agree to the following provisions as the sole shareholders, namely ALLIANCE and APMD of the CORPORATION.

The parties agreed that PMPLIC's certificate of incorporation would authorize PMPLIC to issue twenty-five million shares of common stock. PMPLIC would issue 12,240,000 shares to Praesidium Alliance for its contribution of "Intellectual Properties" and 11,760,000 shares to APMD Holdings for its contribution of "10 Million shares of convertible Preferred stock at a par value of $5 of Anderson Mining Corporation." The agreement stated that APMD Holdings' "contribution is to serve as 'designated Capital Surplus' (herein meaning not to be used or encumbered by the CORPORATION for operational expenses, and additionally as defined and interpreted by the Delaware Department of Insurance)" and that APMD Holding could, at any time, redeem all or part of the shares at $5.00 per share.

The Memorandum of Agreement also specified that Praesidium Alliance would elect three members to serve on PMPLIC's Board of Directors—Gary Schneidmiller, Eric Schneidmiller, and Dr. Robert Felter, who would serve as the

"resident director" in accordance with Delaware Department of Insurance requirements—and APMD Holdings would elect two members to serve on the Board—Mayfield and Anderson. The Agreement also included provisions stating that Praesidium Alliance "agrees and acknowledges that a condition of the contribution by APMD to the 'designated Capital Surplus' is to eventually result in the CORPORATION qualifying to be a public company and supports this as a strategic objective of the CORPORATION" and that the Memorandum of Agreement "is the full and complete agreement of the ALLIANCE and APMD as shareholders of the CORPORATION and all other matter[s] not expressly stated herein shall not be construed to be subject to this memorandum of agreement."

PMPLIC was incorporated in Delaware on December 27, 2007. The Certificate of Incorporation provided that PMPLIC would have authority to issue twenty-five million shares of stock. The five individuals mentioned in the Memorandum of Agreement—Gary and Eric Schneidmiller, Dr. Felter, Mayfield, and Anderson—were all elected to PMPLIC's Board of Directors. By unanimous consent, PMPLIC's Board of Directors approved the issuance of 12,240,000 shares of stock to Praesidium Alliance in exchange for "Intellectual properties and 'Trade Secret' knowhow, including insuring systems and processes," $100,000 cash, and "such future cash as may be required by the Delaware Department of Insurance up to $1,000,000." The Board also approved the issuance of 11,760,000 shares of stock

7

to APMD Holdings in exchange for 10 million shares of convertible preferred stock, $5.00 par value per share of Anderson Mining Corporation "as designated Capital Surplus as more fully described in the 'Memorandum Agreement of the Shareholders' effective December 21, 2007." On December 28, 2007, APMD Holdings issued a stock certificate reflecting that it had issued ten million shares of convertible preferred stock, $5.00 par value, to PMPLIC. PMPLIC, in turn, issued a stock certificate on December 31, 2007, reflecting that it had issued 11,760,000 shares to APMD Holdings.[1]

Gary Schneidmiller testified that PMPLIC could not have obtained a license to sell insurance without having capital surplus in place and that, as of the end of 2007, he believed APMD Holdings had issued its stock certificate in good faith and that "those 10 million shares had a $5 par value," thus establishing a $50,000,000 capital surplus. Having incorporated PMPLIC, Praesidium moved forward with its attempt to obtain a license for PMPLIC with the Department, and it made a submission to the Department in February 2008. As part of its submission, PMPLIC had to demonstrate that it had a sufficient capital surplus, and it notified the Department that its ten million convertible shares in Anderson Mining Corporation,

---

[1]    Gary Schneidmiller testified that, per an e-mail conversation with Mayfield, PMPLIC did not deliver the stock certificate to APMD Holdings, but instead kept it for "safekeeping."

8

worth $5.00 per share upon redemption by the company, would serve as its capital surplus.

During the licensing process, the Department contacted Praesidium and requested audited financial statements from APMD Holdings. Praesidium passed this request on to APMD Holdings. Schneidmiller testified that the Department officials "wished to have confirmation directly from APMD that [it] had the assets and that the 50 million [capital surplus] was established." He also stated that the Department made inquiries concerning APMD's assets, its ability to convert those assets into cash, and how much time that conversion would take.

In April 2008, Mayfield wrote the following letter to an official at the Department:

> In response to your request of April 15, 2008, to Praesidium Medical Professional Liability Insurance Company (PMPLIC), this letter is to assure you and the Delaware Department of Insurance, that APMD Holdings, Inc. (APMD), is committed to honoring the cash conversion provision of the "Convertible Preferred Shares" held by PMPLIC. APMD has more than sufficient assets to convert the shares of "Convertible Preferred Stock" of the Corporation, an amount in cash equal to the Redemption Price. The ten million "Convertible Preferred Stock" owned by PMPLIC shall at all times have a par value of Five U.S. Dollars ($5.00) per share, for a total of Fifty Million U.S. Dollars ($50,000,000). This conversion into cash shall occur within a maximum of sixty (60) days from our receipt for Redemption by PMPLIC.

Despite Mayfield's assurances, the Department still required audited financial statements, and Gary Schneidmiller continued to request these statements, only to

9

be told that APMD Holdings was in the process of finishing the statements.  APMD Holdings never presented audited financial statements to Praesidium or to the Department.[2]  Schneidmiller testified that without an independent verification of APMD Holdings' financial viability, the Department would not approve PMPLIC's application for licensure.  Ultimately, PMPLIC withdrew its application for licensure, and it never obtained a license to operate as an insurance company.

In March 2009, Schneidmiller, on behalf of PMPLIC, wrote a letter to Anderson, informing him that, upon the Department's request, PMPLIC was exercising its option to redeem all ten million shares of its convertible preferred stock for a total cash redemption value of $50,000,000.  In response, PMPLIC received a letter from APMD Holdings' attorney denying Schneidmiller's redemption request because, in its view, PMPLIC was "not the holder of any shares of Class C Convertible Preferred Stock."  Counsel stated:

> A.    No consideration was ever given for the Class C Convertible Preferred Stock.  It does not appear that there was a separate agreement governing the exchange of common stock in [PMPLIC] for preferred stock in APMD.  However, based on the resolutions, it is clear that the intention was that APMD was to receive 11,760,000 shares of common stock of [PMPLIC] which was never received.
>
> B.    The Class C Convertible Preferred Stock did not exist at the time of the exchange agreement, if any. If there was an agreement to exchange common stock for preferred stock, and even if APMD had received valid consideration, the agreement to exchange would have

---

[2]    Mayfield testified that, during his tenure as the CEO of APMD Holdings, he never saw any audited financial statements for the company.

existed on or about December 2007. The preferred stock was not in existence until the Amendment was filed on April 2, 2008.[3] Under Delaware corporate law, the preferred stock cannot be issued until it existed, and at best you would have an agreement to enter into an agreement.

C.    APMD does not have the ability to honor a redemption under the terms of the preferred stock or under Delaware corporate law. Even if you were the valid holder of the preferred stock, under the terms of the preferred stock as set forth in the Amendment, APMD does not have the funds legally available for a redemption.

APMD Holdings thus "cancel[ed] any and all agreements between [PMPLIC] and APMD," Anderson and Mayfield resigned from all officer and director positions with PMPLIC, and APMD cancelled the stock certificate issued to PMPLIC.

Four months later, in September 2009, Anderson sent a letter to Gary Schneidmiller stating,

Please accept this letter as our acknowledgement that we are in agreement that in fact the transaction between our two companies did take place. However, that transaction was disrupted by intervening events. We would like to work [on] reconstructing our relationship so we can move forward for the benefit of both our companies.

We look forward to finalizing this transaction in a manner, which is positive for all parties.

---

[3]    On April 2, 2008, APMD Holdings executed a corporate resolution amending its certificate of incorporation as it related to the classes of shares that it had authorized. This resolution authorized 10,000,000 shares of Class C Convertible Preferred Stock at $5.00 per share par value and included detailed information concerning when and how APMD Holdings could redeem these shares. The resolution also authorized 40,000,000 shares of Class D "Preferred Stock" with no par value. Gary Schneidmiller testified that APMD Holdings originally issued shares to PMPLIC in December 2007, but in April 2008, APMD Holdings "broke [its] preferred class into two sections so [it] wouldn't be stuck with a convertible preferred." He stated, "[T]he shares that PMPLIC owns stayed in that class which [APMD] call[s] Class C."

11

Schneidmiller testified that Praesidium continued working with APMD to try to establish the capital surplus for PMPLIC, but the parties were unable to do so. Praesidium sought other investors and sources of revenue for the capital surplus.

In 2010, two of Praesidium Alliance's minority investors sued Praesidium Alliance, the Schneidmillers, and three other defendants for fraud arising out of the failed APMD deal. The case proceeded to arbitration, and in 2012, an arbitration panel ultimately awarded the plaintiffs $2,000,000 in damages plus interest and costs against Praesidium Alliance, the Schneidmillers, and the other defendants. As of the date of the trial in the underlying case, in July 2016, Praesidium Alliance and the Schneidmillers owed $3,181,710 on this arbitration award. Schneidmiller testified that Praesidium Alliance paid around $300,000 in attorney's fees and that he spent around $600,000 in out-of-pocket expenses to start up PMPLIC. He also testified that he had not been able to work in the insurance industry in the four years since the arbitration award had been entered and that his average salary had been around $200,000 per year, for a total of around $800,000 in lost wages.

Praesidium sued APMD for breach of contract, breach of fiduciary duty, and fraud. Through a reverse merger occurring after the events that formed the basis of Praesidium's lawsuit, APMD Holdings and APMD, Inc. became subsidiaries of CJT

12

Financial, Inc. and CJT Mining, Inc.[4]  After this merger occurred, an independent audit of CJT Financial and its subsidiary, APMD Holdings, was conducted and demonstrated that from APMD Holdings' inception in 2006 through the end of 2012, the company had never made any money.

After a bench trial, the trial court awarded $4,081,710 in damages, $342,200 in attorney's fees, post-judgment interest, and costs to Praesidium.  The final judgment did not state the causes of action on which the trial court found in favor of Praesidium, instead only stating that Praesidium was "awarded judgment in the amount of $4,081,710.00 against Defendants [APMD]."  Despite both parties filing proposed findings of fact and conclusions of law, the trial court did not enter findings and conclusions.  APMD filed a motion for new trial, which was overruled by operation of law.  This appeal followed.

## Standard of Review

In a bench trial in which the trial court does not file findings of fact or conclusions of law, we imply all findings of fact necessary to support the judgment.[5]

---

[4]   All four entities, along with Mayfield and Anderson, were defendants in the trial court and are appellants in this appeal.

[5]   Praesidium filed proposed findings of fact and conclusions of law before trial, and APMD filed proposed findings and conclusions with its written brief submitted after the close of evidence.  The trial court did not file findings of fact and conclusions of law.  APMD did not, however, file a notice of past due findings of fact and conclusions of law. *See* TEX. R. CIV. P. 297.  APMD's failure to file a notice of past due findings and conclusions waives any appellate complaint concerning the trial court's failure to file such findings and conclusions. *See Guillory v. Boykins*, 442

13

*Puntarelli v. Peterson*, 405 S.W.3d 131, 134 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *BMC Software, Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)); *see Wood v. Kennedy*, 473 S.W.3d 329, 334 (Tex. App.—Houston [14th Dist.] 2014, no pet.). These implied findings of fact have the same weight as a jury's verdict. *Puntarelli*, 473 S.W.3d at 134. When the appellate record includes the reporter's record and the clerk's record, implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Wood*, 473 S.W.3d at 334. We review the sufficiency of the evidence supporting the findings by applying the same standards that we use in reviewing the legal or factual sufficiency of the evidence supporting jury verdicts. *Puntarelli*, 473 S.W.3d at 134 (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)).

In reviewing the legal sufficiency of the evidence, we consider whether the evidence presented at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We consider the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that supports that finding, but we may not disregard

---

S.W.3d 682, 694 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Am. Realty Trust, Inc. v. JDN Real Estate-McKinney, L.P.*, 74 S.W.3d 527, 530 (Tex. App.—Dallas 2002, pet. denied).

evidence that allows only one inference. *Id.* at 135. If the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* at 134. The fact-finder is the sole judge of the credibility of the witnesses and the weight to give to their testimony. *Id.* at 135; *see Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 315 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

In reviewing the factual sufficiency of the evidence, we consider all of the evidence supporting and contradicting the finding. *Puntarelli*, 405 S.W.3d at 135 (citing *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989)). We will set aside the verdict only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

### Breach of Contract

In its first issue, APMD contends that the trial court abused its discretion in granting final judgment against it because the Memorandum of Agreement was not a valid and enforceable contract. In its second issue, APMD contends that, if the Memorandum of Agreement was a valid contract, it was not breached. In its third and fourth issues, APMD argued that Praesidium Alliance did not suffer any damages as a result of a breach of the Agreement and that the trial court abused its discretion in awarding legal damages of $4,032,000.

15

## A.    *Contract Formation*

The essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  A breach of the contract occurs when a party fails or refuses to do something it has promised to do.  *Id.* (quoting *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied)); *see Garcia v. Sasson*, 516 S.W.3d 585, 592 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Parties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding.  *Winchek v. Am. Express Travel Related Servs. Co.*, 232 S.W.3d 197, 202 (Tex. App.—Houston [1st Dist.] 2007, no pet.).  The determination of meeting of the minds is based on the objective standard of what the parties said and did and not on their subjective state of mind.  *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

For the contract to be enforceable, the terms of the contract must be sufficiently certain to enable a court to determine the rights and responsibilities of

the parties. *Winchek*, 232 S.W.3d at 202 (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)); *see Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000) ("In general, a contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations."). The Texas Supreme Court has stated:

> [A]n agreement to make a future contract is enforceable only if it is "specific as to all essential terms, and no terms of the proposed agreement may be left to future negotiations." It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree.

*Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846; *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Essential terms are "those terms that the parties 'would reasonably regard as vitally important elements of their bargain.'" *Stergiou*, 438 S.W.3d at 744 (quoting *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2007, no pet.)). The material terms of a contract are determined on a case-by-case basis. *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (per curiam). Texas courts favor validating contracts rather than voiding them, but we may not create a contract where none exists, and we generally may not add, alter, or eliminate essential terms. *Stergiou*, 438 S.W.3d at 744–45.

In this case, Gary Schneidmiller, on behalf of Praesidium Alliance, and Greg Mayfield, on behalf of APMD Holdings, signed a "Memorandum of Agreement" on

17

December 21, 2007.  The Agreement recited that, on August 27, 2007, the parties had agreed to "merge their respective resources" to create PMPLIC, which was "being prepared for incorporation in the State of Delaware as a stock company (C-Corporation)," and that the parties "wish[ed] to reduce to writing therein various oral agreements and written assurances to each other."  The Memorandum of Agreement provided that PMPLIC would be governed by by-laws that would be filed at the time of incorporation and that could be modified by a majority vote of the Board of Directors or the shareholders.  The Agreement provided that PMPLIC's certificate of incorporation shall authorize the company to issue 25,000,000 shares of one class of common stock, in accordance with Delaware regulations.  The Agreement set out the required consideration by both parties: Praesidium Alliance shall contribute "Intellectual Properties" and would receive 12,240,000 shares of stock in PMPLIC, for 51% ownership of the insurance company, and APMD Holdings shall contribute "10 Million shares of convertible Preferred stock at a par value of $5 of Anderson Mining Corporation [APMD Holdings]" in exchange for 11,760,000 shares of stock in PMPLIC, for 49% ownership of the company.

The Agreement further provided that APMD Holdings' contribution would "serve as 'designated Capital Surplus' (herein meaning not to be used or encumbered by [PMPLIC] for operational expenses, and additionally as defined and interpreted by the Delaware Department of Insurance)."  APMD Holdings could "at any time

18

redeem all or part of the preferred shares" that it had contributed at a value of $5.00 per share. The Agreement also specified that PMPLIC's Board of Directors would include five members, three selected by Praesidium Alliance and two selected by APMD Holdings. The Agreement then named Praesidium Alliance's selections—Gary Schneidmiller, Eric Schneidmiller, and Dr. Robert Felter, who would satisfy the Delaware Department of Insurance's "resident director" requirement—and APMD Holdings' selections—Greg Mayfield and Fred Anderson. The Agreement also contained a provision in which Praesidium Alliance "agrees and acknowledges that a condition of the contribution by APMD to the 'designated Capital Surplus' is to eventually result in [PMPLIC] qualifying to be a public company and supports this as a strategic objective of [PMPLIC]." Finally, the Agreement included a provision stating that it was "the full and complete agreement of [Praesidium Alliance] and APMD as shareholders of [PMPLIC] and all other matter[s] not expressly stated herein shall not be construed to be subject to this memorandum of agreement."

The Memorandum of Agreement thus set out the goal of the agreement: the creation and incorporation of PMPLIC, which would eventually become a public insurance company. It set out the corporate structure of PMPLIC, including who would serve on the Board of Directors. It set out the consideration required from both Praesidium Alliance and APMD Holdings and what each party would receive

19

in exchange for that consideration. It stated that APMD Holdings' contribution of ten million shares of convertible preferred stock of Anderson Mining Corporation was to be used as PMPLIC's capital surplus, and not to cover its operational expenses, as required by the Delaware Department of Insurance, and the Agreement provided that each share had a redemption value of $5.00 per share. The Agreement does not contemplate the execution of any further documents or agreements between the parties in the future. No terms in the Agreement were left open for future negotiation. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846 (stating that if agreement leaves material matters open for future negotiation which never occurs, agreement is not binding on parties and is merely "agreement to agree").

On appeal APMD argues that the August 13, 2007 letter from Mayfield to Schneidmiller, in which Mayfield cautioned that "we will need to have the approval of the State Insurance Commission before moving forward with this transaction," demonstrates that the parties had a "clear intent" that only the Department's approval "could allow the transaction to move forward." APMD also argues, "[I]t is more reasonable that the parties intended to execute a more comprehensive contract in the future after the licensing application was approved." The Memorandum of Agreement itself, however, does not bear out this reading. It does not state that the Department's approval of PMPLIC's submission for licensure was a condition precedent to forming a binding agreement between Praesidium Alliance and APMD

20

Holdings. Moreover, the Agreement provided that APMD's consideration—the ten million shares of convertible preferred stock of Anderson Mining Corporation—was to serve as PMPLIC's designated capital surplus, a requirement in order to transact business as an insurance company in Delaware. *See, e.g.*, DEL. CODE. ANN. tit.18, § 511 (West 2018) (setting out capital funds and surplus requirements for companies involved in selling different types of insurance). It follows that APMD Holdings would have to make its contribution to PMPLIC before PMPLIC could seek licensure from the Department. Waiting until after the Department had approved PMPLIC's license to execute a "more comprehensive" contract between the parties would serve no purpose. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005) (stating that, in construing contracts, we ascertain and give effect to parties' intentions as expressed in document, we consider entire writing, and we attempt to give effect to all provisions by analyzing provisions with reference to entire agreement).

APMD also argues that the Memorandum of Agreement does not address the material matter of how redemption of the APMD shares would occur, and because the Agreement does not address this, the Agreement is therefore not an enforceable contract. The Memorandum of Agreement does not specify the procedures that PMPLIC would need to follow in order to redeem its ten million shares of convertible preferred stock, nor does it specify the procedures that APMD would

21

need to follow once it received notice that PMPLIC wished to redeem its shares. However, the Memorandum of Agreement addressed redemption by providing that APMD Holdings could "at any time redeem all or part of the preferred shares of [APMD Holdings] at $5.00 per share." This provision was material and essential to the agreement between the parties, as it established the value of each share of APMD Holdings that PMPLIC would hold as its capital surplus, should PMPLIC need to convert those shares to cash. *See Stergiou*, 438 S.W.3d at 744 (defining "essential term" as "those terms that the parties 'would reasonably regard as vitally important elements of their bargain'"). Provisions regarding the precise steps that the parties would need to take to effect a redemption of the shares were not essential to the parties' bargain.

APMD further argues that the parties understood that redemption of PMPLIC's shares of APMD would occur only if five "preconditions" were met: (1) PMPLIC obtained an insurance license; (2) PMPLIC sold insurance policies; (3) PMPLIC paid claims; (4) PMPLIC depleted its cash surplus; and (5) the Department required PMPLIC to use its capital surplus to pay claims. APMD argues that because PMPLIC never obtained a license, issued policies, or paid claims to insureds, Praesidium and PMPLIC "never delivered on their obligations" and they failed to provide consideration, leading to the conclusion that no contract between the parties existed.

As we have stated, the Memorandum of Agreement set out the consideration that Praesidium and PMPLIC would provide: Praesidium was to contribute the intellectual properties that would form the basis of PMPLIC's business model, and PMPLIC would issue 11,760,000 shares—for a 47% ownership interest in PMPLIC—to APMD upon APMD's issuance of 10,000,000 shares of convertible preferred stock. Gary Schneidmiller testified that both of these things occurred.

With regard to the five "preconditions" identified by APMD, Brian Collins,[6] a defendant in the trial court representing himself pro se, questioned Schneidmiller about an email he had sent to Fred Anderson on August 13, 2008, after the Department had requested audited financial statements from APMD but before the Department demanded conversion of PMPLIC's shares of APMD to cash as a requirement for licensing PMPLIC. Schneidmiller stated in this email, "The APMD shares owned by Praesidium Insurance can only be redeemed if and when the domicile's regulator [i.e., the Department] in effect takes over the company and calls in additional cash resources to pay for claims." Collins then questioned Schneidmiller about the "preconditions" that must occur before APMD's shares

---

[6] In addition to suing the APMD entities, Anderson, and Mayfield, Praesidium also sued Collins, an investor in APMD Holdings who assisted Anderson and Mayfield in attempting to reach a deal with Praesidium after Praesidium demanded redemption of its shares in APMD Holdings. In its final judgment, the trial court ordered that Praesidium take nothing on its claims against Collins. Collins is, therefore, not a party to this appeal.

could be redeemed and whether they occurred in this case. Schneidmiller testified that, in the usual case in which an entity has become licensed to sell insurance, Collins was correct that those "preconditions" are the five steps that must occur before the insurance company can be required to tap into its capital surplus. He testified that these conditions were not relevant to this particular case because PMPLIC never obtained a license to sell insurance, due to APMD's failure to provide audited financial statements to the Department or to otherwise assure the Department that it had the assets to serve as the capital surplus. He also testified that the Department had the right to demand that APMD redeem its shares for cash to ensure that the capital surplus was in place prior to issuing a license to PMPLIC, and the Department made such a demand in this case after APMD did not provide documentation of its ability to redeem the shares.

Under these circumstances, failure to comply with the five "preconditions" identified by APMD does not equate to a failure of consideration or a failure to "deliver on [Praesidium's] obligations." The Memorandum of Agreement set out the consideration owed by each party. Praesidium and PMPLIC complied with these requirements. They presented evidence that, despite APMD's representations that it had the financial means to be able to convert its shares to cash, it did not and could not do so, which led to the ultimate withdrawal of PMPLIC's application for licensure and the inability of PMPLIC to operate as an insurance company as

24

contemplated by the Memorandum of Agreement. We therefore do not agree with APMD that Praesidium failed to provide consideration. *See TMC Worldwide, L.P. v. Gray*, 178 S.W.3d 29, 37 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("Consideration is a present exchange bargained for in return for a promise. It consists of either a benefit to the promisor or a detriment to the promisee.") (quoting *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991)); *see also Burges v. Mosley*, 304 S.W.3d 623, 628 (Tex. App.—Tyler 2010, no pet.) ("Consideration is a fundamental element of every valid contract.").

We conclude that the terms of the Memorandum of Agreement were sufficiently clear and definite for a court to ascertain the rights and responsibilities of the parties. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846; *Winchek*, 232 S.W.3d at 202. Furthermore, the Memorandum of Agreement is specific as to the essential terms, and the Agreement does not leave any material matters open for future negotiation. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846; *Stergiou*, 438 S.W.3d at 744. We therefore conclude that the Memorandum of Agreement is a binding and enforceable contract, and is not an unenforceable "agreement to agree" in the future. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846. We hold that the trial court did not err by impliedly finding that the Memorandum of Agreement constituted a valid and enforceable contract.

## B.    *Evidence of Breach*

APMD argues that Praesidium presented insufficient evidence that APMD breached the Memorandum of Agreement because APMD actually contributed a stock certificate for ten million shares of convertible preferred stock in APMD Holdings to PMPLIC. Praesidium argues that, although APMD provided preferred stock to PMPLIC, that stock was not convertible because APMD Holdings lacked the assets to redeem the shares and convert them to cash, should that become necessary, as it agreed to do in the Memorandum of Agreement. We agree with Praesidium.

The Memorandum of Agreement obligated APMD Holdings to contribute, as consideration, ten million shares of "convertible preferred stock at a par value of $5" of APMD Holdings that would serve as PMPLIC's capital surplus. The Agreement further provided that the shares were redeemable by APMD Holdings "at any time" for a value of $5.00 per share. APMD Holdings delivered a stock certificate to PMPLIC reflecting that it had issued ten million shares of convertible preferred stock, $5.00 par value, to PMPLIC on December 28, 2007.

APMD Holdings provided assurances, both throughout the negotiation process and while the Department was considering PMPLIC's application for licensure, that it had sufficient assets to be able to convert the shares into cash if called upon to do so. After the parties had signed the Memorandum of Agreement

and PMPLIC submitted its application for licensure, the Department requested audited financial statements from APMD Holdings to make sure that it had the ability to convert the shares into cash. Greg Mayfield wrote a letter assuring a Department official that APMD Holdings was "committed to honoring the cash conversion provision of the 'Convertible Preferred Shares' held by PMPLIC," that APMD Holdings had "more than sufficient assets" to convert the shares into a cash amount equal to the redemption price, that the ten million shares had a par value of $5.00 per share "for a total of Fifty Million U.S. Dollars," and that the conversion into cash would occur within sixty days maximum from APMD's receipt of PMPLIC's notice of redemption.

Praesidium subsequently learned that since APMD had begun operating in 2006, it had never had any revenue and had never made a profit. Similarly, in May 2009, after Schneidmiller had requested redemption of PMPLIC's ten million shares, APMD Holdings' counsel denied the request and listed several reasons for doing so, including stating that "APMD does not have the ability to honor a redemption under the terms of the preferred stock" and that "APMD does not have the funds legally available for a redemption."

APMD argues on appeal that the Memorandum of Agreement did not require any party to contribute $50,000,000 in cash. The Memorandum of Agreement did require APMD Holdings to issue to PMPLIC ten million shares of "convertible

preferred stock" in APMD Holdings as capital surplus, which could be redeemed for a price of $5.00 per share, for a total redemption price of $50,000,000, if all ten million shares were redeemed. Praesidium presented evidence that while APMD Holdings issued ten million shares of "convertible preferred stock" to PMPLIC, APMD, contrary to its repeated representations, never had sufficient assets such that it could actually convert the shares into cash, an essential term of the parties' bargain. Praesidium thus presented evidence that the "convertible preferred stock" did not have the value that APMD Holdings had agreed to provide.

We therefore hold that Praesidium presented legally and factually sufficient evidence that APMD Holdings breached the Memorandum of Agreement by failing to provide ten million shares of "convertible preferred stock" that could be converted into cash on demand. *See Puntarelli*, 405 S.W.3d at 134–35; *see also Garcia*, 516 S.W.3d at 592 (stating that breach of contract occurs when party fails or refuses to do something it has promised to do).

## C.    *Evidence of Damages*

APMD contends on appeal that Praesidium failed to present sufficient evidence that any breach by APMD caused Praesidium's injuries. Specifically, it argues that the arbitration award entered against Praesidium and the Schneidmillers, among other defendants, was the result of a lawsuit filed against Praesidium by two other investors, and was not "in any way related to Mayfield, Anderson, Collins, or

28

APMD." APMD also argues that no language in the Memorandum of Agreement required any party to contribute $50,000,000 in cash, and it therefore contends that the trial court abused its discretion in awarding legal damages to Praesidium.

Gary Schneidmiller testified that, even after PMPLIC withdrew its submission for licensure and after APMD Holdings denied PMPLIC's request for redemption of its shares, he continued to work with APMD to "salvage" the deal and to find a method by which APMD could provide the capital surplus for PMPLIC. Praesidium was unable to reach another deal with APMD Holdings, and eventually it sought other sources of funding for the capital surplus. Schneidmiller testified that, in May 2010, two minority investors in Praesidium Alliance sued Praesidium Alliance, the Schneidmillers, and three other defendants, for fraud arising out of the failed transaction with APMD Holdings and the failure of PMPLIC to obtain a license in Delaware. An arbitration panel found that Praesidium Alliance made "material misrepresentations and omissions of material facts" including that "APMD Holdings, Inc. did not have Fifty Million Dollars ($50,000,000) of gold in ready saleable form," that the Schneidmillers did not act in good faith because they "did not use adequate due diligence in verifying the assets of APMD Holdings, Inc.," and that the Schneidmillers did not act in Praesidium Alliance's best interests or use ordinary care by failing "to use due diligence in verifying the assets of APMD Holdings, Inc."

The arbitration panel awarded the claimants a total of $2,000,000 in damages, representing the claimants' respective investments in Praesidium Alliance. The panel also awarded the claimants pre-judgment interest on this award and costs. Gary Schneidmiller testified that as of July 2016, the date of the trial in the underlying case, the defendants owed $3,181,710 on the arbitration award. Schneidmiller testified that he, his son, and Praesidium Alliance were sued "because APMD never came up with the $50 million capital reserve." Schneidmiller also testified that, as a result of the investors' suit against Praesidium Alliance, the defendants paid around $300,000 in attorney's fees, and he spent around $600,000 in out-of-pocket expenses to start PMPLIC.

In its final judgment, the trial court awarded Praesidium $4,081,710 in damages. This amount equals the amount Praesidium owed on the arbitration award, the amount Praesidium spent on attorney's fees to defend itself in the arbitration proceeding, and the amount of out-of-pocket expenses spent in starting PMPLIC. Praesidium presented evidence from which the trial court could conclude that APMD's breach of the Memorandum of Agreement caused Praesidium's damages. We hold that legally and factually sufficient evidence supports the damages award in favor of Praesidium. *See Puntarelli*, 405 S.W.3d at 134–35; *B & W Supply, Inc.*, 305 S.W.3d at 16 (stating that element of breach of contract is that plaintiff sustains damages resulting from defendant's breach).

We overrule APMD's first four issues.[7]

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Brown, and Lloyd.

---

[7] In its fifth and sixth issues, APMD Holdings challenges the sufficiency of the evidence establishing fraud and breach of fiduciary duty. In its final judgment following a bench trial, the trial court awarded Praesidium $4,081,710 in damages against APMD, but it did not specify the cause of action to which these damages related. The trial court did not file findings of fact and conclusions of law. We have held that sufficient evidence supports the trial court's award as damages for breach of contract. Because Praesidium's theories of fraud and breach of fiduciary duty would not afford it any greater relief than its breach of contract theory, which is sufficient to support the trial court's judgment, we need not address APMD Holdings' fifth and sixth issues concerning the fraud and breach of fiduciary duty claims. *See, e.g.*, *Madison v. Williamson*, 241 S.W.3d 145, 159 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (stating that when party tries case on alternate theories and factfinder returns favorable findings on two or more theories, party has right to judgment on theory entitling it to greatest or most favorable relief); *see also* *Wood v. Kennedy*, 473 S.W.3d 329, 334 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (stating that when trial court does not file findings and conclusions after bench trial, appellate court must affirm judgment if judgment "can be upheld on any legal theory that finds support in the evidence").