Opinion issued July 30, 2019



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00060-CV

————————————

## PAUL WRIGHT AND THERESA WRIGHT, Appellants

## V.

## BRANDON LIMING AND JENNA LIMING, Appellees

On Appeal from the 334th District Court
Harris County, Texas
Trial Court Case No. 2018-19746

## MEMORANDUM OPINION

This is an interlocutory appeal of a temporary injunction that prohibits Paul and Theresa Wright from trespassing on property owned by their neighbors, Brandon and Jenna Liming.

In two issues, the Wrights contend the trial court abused its discretion in entering the temporary injunction because the injunction did not meet the requirements of Civil Procedure Rule 683. Specifically, they contend the injunction did not adequately describe the acts the Wrights are prohibited from doing or explain why the Limings do not have an adequate remedy at law. The Wrights contend the temporary injunction is void due to its deficiencies.

While they disagree with the Wrights' contention that the temporary injunction is deficient, the Limings have indicated their agreement to modify the temporary injunction to add specificity.

Because we conclude any deficiencies in the temporary order can be resolved through reformation of the order and remand for that purpose would be a less efficient course, we reform the order and affirm it as reformed.

## Background

Randy Darbonne owned several tracts of land in Kingwood, Texas. In 2003, he began renting a two-tract lot to the Wrights, who later bought the land. In 2017, he sold another two-tract lot to the Limings. When discussing the features of the Wrights' and Limings' properties and how various people used the properties before and after the 2017 sale transaction, we will refer to the property the Wrights bought from Darbonne as D1 and the property the Limings later bought from Darbonne as D2. *See addendum.*

2

The D1 and D2 properties share a border. The Wrights' D1 property has two houses on it: a "main house" near the roadway and a "back house" deeper onto the property. The D1 property has two driveways: one driveway goes to the main house, and the other driveway extends the length of the property alongside both houses. There is an improved walkway connecting the main house and the back house. The Limings' D2 property has only one driveway, which is near the shared border. *See addendum.*

Before the Limings moved to Kingwood, Darbonne used the D2 property to store his boat and various equipment and house a chicken coop. Darbonne did not live on the property. Darbonne allowed the Wrights to park several trucks and trailers on the D2 property. Often, the trucks and trailers would straddle the property line between the two properties. *See addendum.* Darbonne also allowed the Wrights, their family members, and their guests to use the D2 driveway to access the back house on the D1 property.

When Darbonne sold the D2 property to the Limings, he told them the property came with full title and they could lock the gate and block all access to the D2 driveway. The Limings paid for a title search as part of their closing. The search did not reveal any competing ownership interests in the D2 property—the title was clear.

The Limings planned to design and built a custom home on the D2 property. They met their neighbors, discussed their development plans, and began the permitting process for construction. During these initial, neighborly encounters, the Limings told the Wrights that the Wrights needed to remove their vehicles from the Limings' property, and the Wrights agreed they would. At times, the Wrights would remove their trailers and other stored items, but the Wrights never fully remained off the D2 property.

When the Limings' fence contractor appeared one day to install a privacy fence along the property line between D1 and D2, Paul Wright called Brandon Liming and asked Liming to delay installation a couple days because Wright needed to move an underground pipe and the fence would be in his way. Liming agreed to a short delay. Never during this exchange did Wright assert any ownership or equitable right to the Limings' land or dispute Limings' ability to construct a privacy fence along their shared border. Instead, Wright simply asked that fence construction be delayed a couple days to allow Wright to move an underground pipe. After Wright finished moving the pipe, the Limings' fence contractor returned to build the fence.

When the fence contractor returned, the Wrights' equipment was still on the property line, interfering with his ability to install the fence. The contractor approached the Wrights and asked them to move their vehicles off the property line. They asked him to "hold on" while someone got "out of the shower" or went to "get

4

the keys." But they never moved their equipment. After a couple hours of waiting, the contractor called Liming. Liming arrived, and the Wrights moved their equipment slightly off the property line. The contractor told Liming the equipment was still too close to work around and he could not start the installation under those conditions. The fence would have to be installed later.

Later that day, when one of the Limings' other contractors left the D2 property for the day, Liming had the contractor locked the gate. That was the first time the Limings locked their gate since buying the D2 property.

That evening, Paul Wright called the Limings about the locked gate. Wright said the locked gate was preventing his guests from leaving the property, meaning the Wrights' guests were on the Limings' property and could not leave through the Limings' locked gate. Liming said he would drive over and unlock the gate for them to leave. Before he got there, the Wrights cut the Limings' lock, forced open the Limings' gate, and drove off the D2 property using the Limings' driveway.

When he arrived, Brandon Liming questioned the Wrights and their guests about cutting his lock. According to Liming, one of the Wrights' guests showed Liming a Louisiana police badge and told Liming he could not lock the gate to the driveway because the Wrights have an easement. According to Liming, the Wrights had never claimed to have an easement or any ownership interest in his property

5

before that night, which was some eight months after the Limings bought the D2 property and began telling the Wrights to remove their vehicles and equipment.

The Limings called their title company about the claimed right to an easement. The title company looked over the title documents and confirmed title was clear.

When the Wrights cut the Limings' lock and asserted an easement interest in the Limings' property, the Wrights offered to buy a fifteen-feet-wide strip of the Limings' property roughly the width of the single driveway on the D2 property. The Limings did not want to sell any of their land. They rejected the offer.

The Limings asked Darbonne about the Wrights' claimed right to access. Darbonne said the Wrights had no right to the D2 property. Darbonne explained he allowed the Wrights to use the D2 property by permission when he owned it. He did so for many years, but it was always use by permission. Darbonne said he had complained to the Wrights a couple times in the past about inconsiderate use of his land, and the Wrights had agreed to adjust their use. At one point, Darbonne installed a gate across the D2 driveway and told the Wrights he would lock the gate and end their access if they did not use his property with more care. According to Darbonne, the Wrights adjusted their use to meet his requirements and he continued his permission to use his D2 land.

Darbonne later provided an affidavit in support of the Limings' litigation to remove the Wrights from their property. The affidavit is in the record, and Darbonne

testified about its contents. Darbonne averred that he sold the property at 3907 Long Leaf Lane, Porter, Texas, 77365 to the Limings and that he sold the property immediately next door to the east, 3911 Long Leaf Lane, to Paul and Theresa Wright. The Wrights had requested that Darbonne allow them to use his driveway to access the west side of their property to park their cars. Darbonne agreed to allow them access, but, according to the affidavit, "access was granted subject to [Darbonne's] full control over the property and to the withdrawal of the privilege at any time at [his] discretion." He further averred that the Wrights had damaged his driveway at one point, and, as a result, he denied them access, after which they agreed to fix the damage they had caused. Darbonne allowed additional access with his permission after the driveway was fixed.

In his affidavit, Darbonne stated he never intended to grant the Wrights an easement, never allowed them to make permanent improvements on his property, and never provided them any written documentation indicating the grant of an easement.

Paul Wright testified about his family's past use of the D2 driveway and land. He testified the D2 driveway is used to access the back house on his D1 property. Wright said he has rented out his back house to various people over the years and his daughter was living there at the time of the hearing. Wright was asked about his and his guests' vehicles often being parked under a tree near his main house. Wright

7

responded by linking the parking to the desire for access to the back house: "Well, they're parked over there. But, I mean, they're for the backhouse. That's why they're parked there."

Wright was asked why he and his family do not use their own two driveways rather than insist on using the Limings' only driveway. He said, "Because, for 15 years, I've done off that driveway." When Wright was asked to agree his D1 driveway leads directly to his main house and there is a walkway connecting his main house to his back house, for access, Wright testified he does not want people going near his main house—where he lives—to access his back house: he preferred they use the Limings' D2 driveway instead. He considered the Limings' driveway to be the appropriate access point to reach his D1 back house: "There is a driveway going to the back. It just happens to be on their land."

Wright agreed he once tried to buy from the Limings the width of the Limings' D2 driveway. He later conceded that "you don't buy something that's already yours."

Wright also clarified who cut the Limings' gate lock: it was his son, a Louisiana police officer.

Brandon Liming testified the ongoing conflict with the Wrights over their easement claim prevented the Limings from moving forward with construction of their new home. The building contractor would not lay the foundation because there

8

was a dispute over the property. The builder's vendors and subcontractors also would not move forward with the project. The Limings argued they needed the temporary injunction to allow construction of their home to begin.

At the end of the temporary injunction hearing, the Wrights argued they had an equitable easement by estoppel.[1] The Limings argued there was no ownership interest and they had met the standard for a temporary injunction prohibiting the Wrights from trespassing on their D2 land during the pendency of the litigation. The trial court granted a temporary injunction.

The temporary injunction prevents the Wrights from trespassing on the Limings' D2 property and prevents the Wrights and their "agents, servants, family members and employees from directly or indirectly accessing or attempting to use"

---

[1] Generally, the grant of an easement must be in writing. *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983). The equitable doctrine of easement by estoppel is an exception to the writing requirement. *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 209 (Tex. 1962). A landowner may, under some circumstances, be estopped to deny the existence of an easement by making representations acted upon by a purchaser to his detriment. *Id.* at 209–10. There are three elements to an easement by estoppel: (1) the owner of the servient estate communicated a representation, either by words or conduct, to the promisee; (2) the promisee believed the communication; and (3) the promisee relied on the communication. *See Storms v. Tuck,* 579 S.W.2d 447, 452 (Tex. 1979); *Kolb v. Scarbrough*, No. 01-14-00671-CV, 2015 WL 1408780, at *6 (Tex. App.—Houston [1st Dist.] Mar. 26, 2015, no pet.) (mem. op.). An easement by estoppel may be imposed against a subsequent purchaser for value if the subsequent purchaser had notice—actual or constructive—of the easement claimed or if reliance upon the existence of the easement continued after the sale. *Kolb*, 2015 WL 1408780, at *6. The grant of an easement by estoppel depends on the unique facts of each case. *Id.*

the Limings' D2 property or "interfering with [the Limings'] use of the property until further orders by the court."

The Wrights appealed.

## Temporary Injunction

The Wrights contend the trial court abused its discretion in granting the temporary injunction with inadequate detail.

## A.      Standard of review

Whether to grant a temporary injunction lies within the trial court's sound discretion. Midway *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.). We will not reverse the trial court's order unless the trial court's action was "so arbitrary as to exceed the bounds of reasonable discretion." *Id.* A trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

## B.      Applicable law

"A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *TMC Worldwide, L.P. v. Gray*, 178 S.W.3d 29, 36 (Tex. App.—Houston [1st Dist.] 2005, no pet.). To obtain a temporary injunction, an applicant must plead and prove three elements: (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a

probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *TMC Worldwide*, 178 S.W.3d at 36; *cf. McGlothlin v. Kliebert*, 672 S.W.2d 231, 232 (Tex. 1984) ("A temporary injunction will not be granted where there is a plain and adequate remedy at law.").

Rule 683 of the Texas Rules of Civil Procedure set forth various requirements of a temporary injunction. The rule provides, in part, as follows:

> Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

TEX. R. CIV. P. 683. The purpose of the rule is to adequately inform the enjoined party of what he is enjoined from doing and the reason why he is enjoined. *In re Chaumette*, 456 S.W.3d 299, 305 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

The Wrights assert the temporary injunction entered against them fails to meet the requirements of Rule 683 because it does not describe in reasonable detail the acts being restrained or how the Limings will suffer an irreparable injury for which there is no adequate remedy at law.

11

## C.     Acts being restrained

The temporary injunction enjoins and restrains the Wrights in two ways. First, it enjoins them "from trespassing onto the Plaintiffs' property either under any claimed easement or for any other purpose during the pendency of this lawsuit as well as in the future." Second, it restrains them and their "agents, servants, family members and employees from directly or indirectly accessing or attempting to use the [Limings'] property as defined in their Warranty Deed for any reason or at any time presently or in the future and/or interfering with the [Limings'] use of the property until further orders by the court."

As to the references to the Limings' property and their Warranty Deed, the Wrights argue "it might certainly be possible to form an educated guess as to what the trial court intended," but, they contend, Rule 683 does not permit a restraint that references outside documents. The Wrights further assert the deficiency makes the order void and subject to being dissolved.

This Court is empowered to modify the terms of an overbroad injunction order. *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 25 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd); *Rubin v. Gilmore*, 561 S.W.2d 231, 236 (Tex. App.—Houston [1st Dist.] 1977, no writ); *San Augustine Ind. Sch. Dist. v. Woods*, 521 S.W.2d 130, 133 (Tex. App.—Tyler 1975, no writ).

The temporary injunction references the Limings' property the Wrights have been using for access, on which the Limings were intending to construct a home, and for which the Limings have a Warranty Deed. The pleadings, trial testimony, and exhibits (including the Warranty Deed), establish the property at issue indisputably is the Limings' property located at 3907 Long Leaf Lane, Porter, Harris County, Texas 77365, which is immediately next door to the Wrights' property, and the parties all understand that to be the property from which the Wrights are prohibited. We reform the temporary injunction to specify the physical address of the property.

The Wrights also argue the temporary injunction wrongly seeks to restrain their "family members" from violating its terms in that the order fails to consider "whether the family members receive actual notice of the temporary injunction."

Rule 683 lists the categories of persons who can be restrained through a temporary injunction. TEX. R. CIV. P. 683. Rule 683 identifies specific categories of persons, according to their relationship to the named defendants, against whom the temporary injunction may be enforced. These include the "officers, agents, servants, employees, and attorneys" of the named defendants. *Id.* Rule 683 also contains a general category of persons who can be brought within the temporary injunction's enforcement: "those persons in active concert or participation with them [the named

13

defendants] who receive actual notice of the order by personal service or otherwise."

*Id.*

The trial court's temporary injunction sought to restrain the Wrights' "family members" but did not convey that they would be subject to the restraining order only to the extent they act "in active concert or participation with" the Wrights and "receive actual notice of the order by personal service or otherwise." We reform the temporary injunction to limit the order's scope to those categories permitted by Rule 683 already listed in the order and the Wrights' family members "who act in concert or participation with the Wrights and have received actual notice of the order by personal service or otherwise." *See T-N-T Motorsports*, 965 S.W.2d at 25 (concluding that injunction complied with Rule 683 in that additional categories of persons were included only to extent they acted or purported to act in concert or participation with named defendants, as required by rule).

To conclude, this Court may reform an overly broad temporary order. We have concluded the trial court's temporary order is overly broad in these two regards. We have further concluded the most efficient course is to reform the temporary order instead of remanding for the trial court to do so. *Compare T-N-T Motorsports*, 965 S.W.2d at 25–26 (reforming overly broad temporary injunction), *with Metra United Escalante, L.P. v. Lynd Co.*, 158 S.W.3d 535, 538 n.1 (Tex. App.—San Antonio 2004, no pet.) (recognizing intermediate appellate court's authority to modify

injunction order but holding, "under the unique circumstances presented," "the more efficient means to clarify the scope of the injunction order is to remand the cause to the trial court" to modify its order).

## D.    Irreparable injury

Next, the Wrights argue the temporary injunction entered against them fails because it does not describe in reasonable detail how the Limings will suffer an irreparable injury for which there is no adequate remedy at law.

"The general rule at equity is that before injunctive relief can be obtained, it must appear that there does not exist an adequate remedy at law." *Butnaru*, 84 S.W.3d at 210 (quoting *Republic Ins. Co. v. O'Donnell Motor Co.*, 289 S.W. 1064, 1066 (Tex. Civ. App.—Dallas 1926, no writ)). "The party requesting the injunction has the burden to establish that there is no adequate remedy at law for damages." *Reach Grp., L.L.C. v. Angelina Grp.*, 173 S.W.3d 834, 838 (Tex. App.—Houston [14th Dist.] 2005, no pet.). "An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief." *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 235 (Tex. App.—Houston [1st Dist.] 2003, no pet.). "An injunction will not issue if damages are sufficient to compensate the plaintiff for any wrong committed by the defendant and if the damages are subject to measurement by an ascertainable pecuniary standard."

*Tom James Co. v. Mendrop*, 819 S.W.2d 251, 253 (Tex. App.—Fort Worth 1991, no writ).

A temporary injunction order must set forth the reasons why injury will be suffered in the absence of a temporary injunction. *State v. Cook United, Inc.*, 464 S.W.2d 105, 106 (Tex. 1971); *Martin v. Linen Sys. for Hosp., Inc.*, 671 S.W.2d 706, 710 (Tex. App.—Houston [1st Dist.] 1984, no writ). The trial court's determination that the plaintiff has established an irreparable injury with no adequate remedy at law is reviewed under an abuse of discretion standard. *Butnaru*, 84 S.W.3d at 211. And the trial court's determination will not be reversed unless it is arbitrary and unreasonable or made without reference to guiding rules and principles. *Id.*

The temporary injunction entered by the trial court states the Wrights "do intend and will continue to trespass" on the Limings' property and "interfere with the construction of" the Limings' "home" absent issuance of a temporary injunction. Such interference would make a later judgment in the Limings' favor inadequate. And additional periods of interference with the Limings' home construction—and, inherent in that, the resulting construction delays—would leave the Limings without an adequate remedy at law.

We conclude the trial court adequately identified the reason why injury would be suffered in the absence of a temporary injunction. *See Fuentes v. Union De Pasteurizadores De Juarez Sociedad Anonima De Capital Variable*, 527 S.W.3d

492, 500–01 (Tex. App.—El Paso 2017, no pet.) (concluding, under particular facts presented, that monetary damages could not make party whole given hardship that would result absent equitable relief). We further conclude the trial court's determination was not an abuse of discretion. *See id.*

## Conclusion

We affirm the temporary injunction as modified.

Sarah Beth Landau
Justice

Panel consists of Justices Lloyd, Landau, and Countiss.

## Addendum



D2 - Limings    17    D1 - Wrights